IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs January 10, 2017

## HENRY THOMAS JOHNSON v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Montgomery County**
**No. 40700905        Jill Bartee Ayers, Judge**

_____

**No. M2016-00820-CCA-R3-PC**

_____

A Montgomery County jury convicted the Petitioner, Henry Thomas Johnson, of premeditated first degree murder and aggravated burglary. On appeal, this Court affirmed the sufficiency of the convicting evidence. *State v. Henry T. Johnson*, No. M2010-02452-CCA-R3-CD, 2012 WL 1071809, at *1 (Tenn. Crim. App., at Nashville, Mar. 28, 2012), *perm. app. denied* (Tenn. May 16, 2012). The Petitioner filed a timely petition for post-conviction relief in which he contended that he had received the ineffective assistance of counsel at trial. After a hearing, the post-conviction court denied the petition. On appeal, the Petitioner maintains his contention, arguing that his trial counsel was ineffective because his trial counsel failed to effectively cross-examine multiple witnesses. After review, we affirm the post-conviction court's judgment.

**Tenn. R. App. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and ROBERT L. HOLLOWAY, JR., J., joined.

R. Allan Thompson, Clarksville, Tennessee, for the appellant, Henry Thomas Johnson.

Herbert H. Slatery III, Attorney General and Reporter; Leslie E. Price; Senior Counsel; Robert W. Wilson, Assistant Attorney General; John W. Carney, Jr., District Attorney General; and Arthur F. Bieber, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I. Facts

# A. Trial

This case arises from the shooting and killing of the victim, Michael Zabik, on March 15, 2007. This Court summarized the facts presented at the Petitioner's trial as follows:

The proof at trial revealed that around 7:30 p.m., Anthony Thomas and Brian Spencer were at Brian's sister's apartment at 101 B Chapel Street. The men heard a knock on the front door and a "commotion" outside. The sister asked who was at the door, and the victim, who lived nearby, identified himself. Brian and Thomas heard someone outside say, "I'm not going to keep telling you about my shit." Brian recognized the voice as the [Petitioner's]. Thereafter, the men heard a single gunshot. Brian opened the door, and the victim "fell in" the apartment. Brian saw someone run away but could not identify the person because it was dark.

Walter Spencer, Brian's brother who lived next door at 101 A Chapel Street, heard the gunshot and went to his sister's apartment to make sure she was okay. He saw the victim lying on the floor "with a hole in his stomach," and he was moaning and bleeding. The men gathered around and asked the victim who shot him. The victim replied, "Kojack," which was the [Petitioner's] nickname. The sister called 911 to report the shooting, and emergency medical services (EMS) and law enforcement responded within minutes.

Agent Gregory Beebe, a narcotics agent with the Clarksville Police Department Major Crimes Unit, was the first officer to respond to the scene. He saw the victim lying just inside the front door of the apartment. The victim was moaning and rocking back and forth. Agent Beebe saw a red, wet spot in the center of the victim's chest. Agent Beebe asked the victim who shot him, and the victim said, "Kojack." Detective David R. Galbraith arrived in time to hear the victim name the [Petitioner] as his assailant.

When Montgomery County Emergency Medical Technician Larry Nolan arrived at the apartment, he immediately noticed that the victim was in critical condition. The victim had been shot in the chest, lost a great deal of blood, and complained of difficulty breathing. The EMS workers placed the victim in the ambulance and transported him to the hospital. When they neared the hospital, the victim's condition started "rapidly deteriorating."

He became agitated and repeatedly said that he did not want to die. As the ambulance pulled up to the hospital, EMS workers performed chest compressions to try to increase the victim's heart rate. Shortly after the victim was transferred to the emergency room, he went into cardiac arrest and died.

Medical Examiner Adele Lewis performed the autopsy of the victim. She determined that the cause of death was a gunshot wound to the torso; the bullet entered just below the left nipple and traveled to the right, downward, and toward the back of the body. The bullet fractured two ribs on the left side and injured the liver and gall bladder. The bullet also injured the vena cava, a major blood vessel that drains blood from the abdomen. Dr. Lewis described the injury to the vena cava as "more often th[a]n not a devastating injury." She estimated that someone with that type of injury could possibly remain conscious for "an hour or two."

Police examined the scene at 101B Chapel Street and the victim's residence at 2112 North Ford Street, which were approximately twenty to twenty-five yards from each other. Detective Galbraith noticed that the victim's front door had been kicked open; three partial shoe prints were left on the door, and the door jamb was damaged. Testing revealed that the shoe prints were made by the [Petitioner's] shoes. Detective Galbraith said that the victim's apartment appeared to have been "ransacked."

Police arrested the [Petitioner] the day after the shooting. Lieutenant David Crockarell, one of the arresting officers, noticed that the [Petitioner] had a "very fresh haircut" and that the appellant's hair was "short . . . almost shaved."

After waiving his Miranda rights, the [Petitioner] initially denied any knowledge of the shooting. However, when he was advised that he had been identified as the shooter, the [Petitioner] said that he shot the victim because the victim was "disrespecting" him. The [Petitioner] said that he was homeless and that the victim allowed him to stay at the victim's apartment while he looked for a place to live. The [Petitioner] found a place but could not move in until April. When the [Petitioner] started moving his belongings out of the victim's residence, he noticed that some of his things were missing. He confronted the victim, who stated that he would get the items back for the appellant the following day. However, he never did. The [Petitioner] said that on the day of the shooting, he went to the victim's house to get the rest of his belongings, including a PlayStation

3

which he planned to sell to a friend. The [Petitioner] said that the victim would not open the door, so the [Petitioner] kicked it open to retrieve his belongings. The victim started calling the [Petitioner] derogatory names and asserted that he would not give the [Petitioner] his PlayStation because the [Petitioner] had damaged the door. The [Petitioner] told police, "It was disrespect to me. He act like he had a gun like he was going to shoot me, but he was too slow, and then it happened." The [Petitioner] said the shooting happened after he and the victim walked to Chapel Street. The [Petitioner] disclosed that he hid the gun under a shed behind a house on E Street. Police found the rifle at the place the [Petitioner] described.

The [Petitioner] also told police that after the shooting, Angela Pittman picked him up "near Royal King." Pittman confirmed that the [Petitioner] asked her to pick him up at the end of E Street and that the [Petitioner] spent the night at her residence. Pittman said the [Petitioner's] demeanor "was [the] same as always," and he showed no indication that something bad had happened. The [Petitioner] shaved his head while at Pittman's house.

Police tested the [Petitioner] and his clothes for gunshot residue. No residue was found on the [Petitioner's] clothes. Tennessee Bureau of Investigation (TBI) Agent Laura Hodge, who analyzed the gunshot residue kit taken from the [Petitioner], stated that the "[e]lements indicative of gunshot residue were absent." She explained that due to the fragility of gunshot residue, "[t]hese results cannot eliminate the possibility the [Petitioner] could have fired, handled or was near a gun when it fired." She stated that the results can be affected by the length of time between the event and testing. The [Petitioner's] hands were tested two and one half hours after the shooting, and his clothes were tested the day after the shooting.

Walter Spencer testified that on March 12 or 13, 2007, he was driving to the store with his three children and the victim. The victim was riding in the passenger seat and the three young children were in the backseat. As Walter turned onto E Street, the [Petitioner] waved for Walter to stop the vehicle. The [Petitioner] approached the passenger side of the vehicle and told the victim, "I want my shit or I'm going to kill you." The victim responded, "I'm not giving you anything." Walter drove away, not wanting his children exposed to further confrontation.

The [Petitioner], who acknowledged that his nickname was

4

"Kojack," testified that on the day of the shooting, he went to the victim's home to retrieve some items he had stored there until he could move into a new residence. The [Petitioner] removed some of his belongings, including a rifle, from a shed behind the victim's residence. Other items were located in the residence, so the [Petitioner] went to the back door. The [Petitioner] knocked several times, but there was no answer. The door was locked, and the [Petitioner] did not have a key.

The [Petitioner] went around to the front door, taking his belongings with him. He looked in the victim's bedroom window and saw that the victim was sleeping. The [Petitioner] knocked on the front door to rouse the victim, but the victim did not answer the door. The [Petitioner] kicked the door, attempting to wake the victim, and the door "came open." The victim came to the door, asking why the [Petitioner] had kicked the door. The [Petitioner] replied that it was an accident and that he would pay to have the door repaired. The [Petitioner] asked the victim to go with him to retrieve the [Petitioner's] DVD player and PlayStation that the victim had "loaned out."

The [Petitioner] and the victim started walking toward Chapel Street; the [Petitioner] was carrying his rifle in his hand, pointing it downward. The [Petitioner] asked what was bothering the victim, and the victim told the [Petitioner] that it was none of the [Petitioner's] business. The [Petitioner] replied, "I ain't going to have you talking to me like of some kind of child." The [Petitioner] told the victim that he was upset that the victim had loaned his property in order to get drugs without the [Petitioner's] permission. The [Petitioner] said that the victim then "ma[d]e a move" and that the [Petitioner] threw up his hand to avoid being hit in the face. The victim hit the [Petitioner's] arm, causing the [Petitioner] to lose his grip on the rifle. The [Petitioner's] finger accidentally caught the trigger, and the rifle fired. The victim grabbed his left side, and the [Petitioner] ran away. The [Petitioner] said that he felt bad and that he did not intend to shoot the victim.

Sometime after the shooting, the [Petitioner] asked someone whether a warrant had been issued for his arrest, and he was told that he was wanted for homicide. The [Petitioner] said that he "prepared for jail; I cut my braids off, because I knew I didn't have no one to do my hair [in jail.]" Shortly thereafter, the [Petitioner] was arrested.

The [Petitioner] said that he initially denied any knowledge of the

5

shooting because he was "a little confused." He denied telling police that he shot the victim because the victim disrespected him, explaining that he meant to say that the victim had been disrespectful by loaning the [Petitioner's] property without permission.

The [Petitioner's] former mother-in-law, Patricia Mize, testified that the [Petitioner] was a truthful person and that he took care of his children. Mize acknowledged that she was unaware that the [Petitioner] owned a gun.

Based on the foregoing, the jury found the [Petitioner] guilty of first degree premeditated murder and aggravated burglary. The trial court imposed an effective sentence of life imprisonment.

*Johnson*, 2012 WL 1071809, at *1-4.

### B. Post-Conviction

The Petitioner filed a timely petition for post-conviction relief, alleging in relevant part that his trial counsel was ineffective because he failed to effectively cross-examine multiple witnesses. At a hearing on the petition, the parties presented the following evidence, as relevant to the issues maintained on appeal: The Petitioner testified that he was concerned that the State presented evidence that the Petitioner intentionally killed someone when he did not. He said that his attorney ("Counsel") gained information from discovery that corroborated his account of what had transpired between the Petitioner and the victim. The Petitioner noted that multiple witnesses testified that the victim's wound was in his abdomen but that the evidence presented at trial showed that the bullet wound was in the victim's chest. The Petitioner opined that the victim's wound being in his abdomen, rather than his chest, showed that the killing was not intentional.

The Petitioner complained that Counsel did not cross-examine Tennessee Bureau of Investigation ("TBI") Agent Hodge. He said that Counsel "really never sought to seek the results or the documentation from these witnesses that he should have known would have been testifying for the State."

During cross-examination, the Petitioner conceded that at trial multiple witnesses testified that the victim stated that "Kojack" had shot him. The Petitioner said that Detective Charvis never interviewed him and that he never gave the detective a statement with regard to this shooting. The Petitioner agreed that he had testified to the jury that the shooting was accidental.

6

TBI Agent Laura Hodge testified that she did not recall Counsel speaking with her about this case before trial. She said that she routinely spoke with defense attorneys regarding her scientific findings. During cross-examination, Agent Hodge testified that a "low percentage," maybe five percent, of defense attorneys sought to interview her before trial.

Linda Littlejohn, a witness who testified at trial, testified that she did not recall speaking with Counsel before the Petitioner's trial.

Elizabeth Reid, a State witness at trial, testified that she did not speak with Counsel before the trial. During cross-examination she testified that she spoke with defense attorneys before trial in less than five percent of the cases in which she testified.

James Russell Davis, a State's witness at trial, testified that he did not recall speaking with Counsel before trial. During cross-examination, Agent Davis testified that he rarely spoke with either the prosecutor or defense counsel before trial.

Counsel testified that the defense theory of the case was either that the Petitioner had shot the victim accidentally or in self-defense. Counsel said he did not recall the distinction between whether the gunshot wound was to the victim's abdomen or chest. Counsel said he did investigate the path of the bullet. He agreed that this information would have been "[p]ossibly" important if the Petitioner and the victim were involved in a struggle. He agreed that he could have questioned the doctor who performed the autopsy about this information. He also agreed that he could have asked TBI Agent Scott, a gun expert, hypothetical questions before trial and during the trial regarding the distance the gun may have been from the victim.

Counsel said that he thought that the evidence showing that the victim had marijuana had been presented to the jury. He said he believed that the medical examiner testified about that. Counsel said that he did not contact any of the TBI agents who testified before trial to ask them hypothetical questions. He said he also did not request that the victim's clothing, other than his shirt, be tested for gun powder residue.

Counsel agreed that the Petitioner wrote him letters before trial and that, in some, he expressed concerns about the location of the gunshot wound. Counsel said that the defense theory presented to the jury was that the shooting was an accident and that he relied heavily on the Petitioner's testimony to support this theory.

During cross-examination, Counsel testified that he knew before trial that one of the victim's neighbors intended to testify that the Petitioner had threatened to kill the victim three days before the shooting. He pointed out to the Petitioner that the

7

Petitioner's statement that the shooting was accidental conflicted with this witness's testimony. Counsel said that the most difficult aspect of this case was attempting to get the Petitioner to maintain a consistent statement. Counsel opined that the location of the bullet wound and the bullet's path while inside the victim did not prove whether the shooting was committed by accident or with premeditation.

During redirect examination, Counsel agreed that any evidence of a struggle between the Petitioner and the victim could have been relevant.

During recross examination, Counsel testified that the State gave him the autopsy report before trial. He reviewed that report and did not find any evidence that the victim had defensive wounds.

The post-conviction court took the matter under advisement and then issued an order denying the Petitioner post-conviction relief. The order addressed each of the issues raised by the Petitioner. On appeal, the Petitioner maintains only that Counsel failed to effectively cross-examine the medical expert witnesses. About that issue, the post-conviction court found:

> *Failure to Cross-Examine Witnesses Adequately or Speak with Witnesses Before Trial*
>
> In an issue related to those stated earlier, the [P]etitioner argues [Counsel] inadequately cross-examined witnesses, particularly Detective Charvis and Agents Hodge and Scott. Accordingly, the [P]etitioner argues, "Very little science was developed by the defense" and trial counsel's failings left the jury with very little evidence which could have supported a verdict on a lesser offense.
>
> While the trial record reflects [Counsel] cross-examined several witnesses briefly or not at all, the [P]etitioner has not presented any evidence suggesting [Counsel's] cross-examinations prejudiced him. Four of the five TBI forensic scientists who testified at the [P]etitioner's trial testified at this hearing, but post-conviction counsel's questions of these witnesses established only that [Counsel] did not speak with these agents before trial and that the agents would have been willing to talk to [Counsel] had he approached them. Furthermore, Agent Scott and Detective Charvis did not testify at the post-conviction hearing at all. Accordingly, nothing was presented at the post-conviction hearing regarding the manner of evidence which could have or should have been developed had trial counsel cross-examined these witnesses consistent with [the Petitioner's] assertions.

Absent such evidence, this Court must conclude the [P]etitioner has not established [Counsel's] cross-examining of these witnesses prejudiced him. And given the TBI agents' testimony regarding the rarity of their pretrial discussions with defense attorneys, the Court cannot conclude [Counsel's] failing to talk to the forensic analysts before trial constituted deficient performance. Accordingly, counsel did not render ineffective assistance as to this issue.

It is from this judgment that the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner contends that the post-conviction court erred when it denied his petition for post-conviction relief because Counsel failed to "effectively cross-examine the medical expert witnesses." He asserts that there was little or no development from a defense standpoint, through the medical experts, of how the bullet path might have been accomplished, or as to what posture or position the deceased may have been in when he received the gunshot. This evidence, he asserts, would have supported his account that the gunshot was the result of a struggle and was an accident. The State counters that the Petitioner has not met his burden of showing that he received the ineffective assistance of counsel. We agree with the State.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2014). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2014). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999) (citing *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997)). A post-conviction court's factual findings are subject to a de novo review by this Court; however, we must accord these factual findings a presumption of correctness, which can be overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely de novo review by this Court, with no presumption of correctness. *Id.* at 457.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6

S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, "a petitioner must show that counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland*, 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court should avoid the "distorting effects of hindsight" and "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 689-90. In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "'The fact that a

10

particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation.'" *House*, 44 S.W.3d at 515 (quoting *Goad*, 938 S.W.2d at 369).

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

In the case under submission, the Petitioner contends that Counsel was ineffective in his cross-examination of the medical expert witnesses and the TBI agents. We agree with the post-conviction court that the Petitioner has not met his burden of proof. The witnesses who testified at the post-conviction hearing agreed that Counsel did not approach them pretrial to ask hypothetical questions and that, had Counsel done so, they would have answered any questions. They also said that generally they did not speak with the State's attorney or defense attorneys pretrial. Counsel said that he did not approach the witnesses because the theory of the case was that the shooting was accidental and that he intended to present this theory through the Petitioner's testimony. The Petitioner testified at trial and told the jury that the shooting was an accident.

The Petitioner presented no evidence at the post-conviction hearing that Counsel was ineffective for not speaking with the witnesses before trial. He further presented no evidence at the post-conviction hearing about how any hypothetical questions posed to the jury would have changed the outcome of the trial. The facts of the case remain that the Petitioner threatened to kill the victim three days before he shot him. Before he died, the victim identified the Petitioner as the shooter. The Petitioner gave a statement to police saying that he shot the victim for disrespecting him. We conclude that, considering the weight of the evidence, the Petitioner cannot prove that he was prejudiced by Counsel's failure to ask the witnesses about the location of the gunshot wound or the path of the bullet. The Petitioner is not entitled to relief.

### III. Conclusion

In accordance with the foregoing reasoning and authorities, we affirm the post-conviction court's judgment.

_____

ROBERT W. WEDEMEYER, JUDGE